**DANIEL v. UNIVERSAL C. I. T. CREDIT CORP.**

No. 2951.

Court of Civil Appeals of Texas. Waco.

March 29, 1951.

Rehearing Denied April 26, 1951.

Lynn B. Griffith, Milton Hartsfield, Waxahachie, for appellant.

Ralph E. Hartman, Forrester Hancock, Waxahachie, for appellee.

HALE, Justice.

Appellee sued appellant for damages on account of the alleged breach of a "Retail Protection Agreement For Automobile Dealers" dated October 21, 1948, hereafter referred to as the protection agreement. On December 21, 1948, R. D. Spann purchased a new Hudson automobile, hereafter referred to as the car, from appellant at the agreed price of $3742.32. Spann paid $1110 in cash or trade-in value and executed a combination note and chattel mortgage covering the car for the balance of the purchase price, the note being payable in 18 equal monthly installments of $146.24 each. For a valuable consideration the note and mortgage was immediately sold and assigned to appellee by appellant without recourse as to Spann's obligation of payment. Spann defaulted in the payment of the note and delivered the car to appellee who, after calling upon appellant to purchase the car at a price equal to the balance due on the unpaid note of Spann, sold the car at auction sale for $1000. Appellee then sued appellant for damages in a sum equal to $1,000 less than the balance due on the unpaid note of Spann.

Appellant answered the suit with a general denial and a plea that he had sold and assigned the note and mortgage to appellee without recourse and without any contingent liability whatsoever. The case was tried before the court below without a jury and resulted in judgment for appellee in the sum of $1339.84. Appellant says the judgment should be reversed and here rendered in his favor because the facts disclosed by the evidence show that he is in no wise liable to appellee under a proper construction of the contractual relations existing between the parties.

We find no material ambiguity in the combination note and mortgage or the written assignment by which the same was transferred to appellee. The assignment was clearly without recourse against appellant. Consequently, if there is any liability from appellant to appellee in this cause the basis thereof must be found in the protection agreement and not in the assignment of the mortgage-note.

The so-called protection agreement was headed in large print "Retail Protection Agreement For Automobile Dealers," was addressed to appellee, was signed by appellant and consisted of 9 numbered para-

graphs as fully shown in the attached footnote.[1] The agreement was not signed by appellee and its terms were not accepted unless the fact that appellee purchased contracts from appellant subsequent to October 21, 1948, constituted an acceptance thereof.

Under the three points in his brief, appellant contends in substance that the dominant

[1] "1. You propose to buy from us, on the basis stated in this agreement, paper acceptable to you covering new and used cars; except as provided in this agreement said paper will be assigned to you without recourse as to the customer's obligation of payment, except that paper covering commercial cars used for long distance hauling, commercial cars of more than two tons capacity, busses, cars used for taxi, jitney, or 'drive-yourself' service, cars sold to relatives or employees, or where otherwise specifically agreed upon, will bear our full recourse endorsement; in such cases you may make any necessary correction in our endorsement and paragraphs 2 and 3 shall not apply.

"2. We will purchase from you each repossessed or recovered car tendered at our place of business within 90 days after maturity of the earliest installment still unpaid. The purchase price payable on demand shall be the unpaid balance due on the car, limited as stated in paragraph 3. Until paying you we will store the car at our risk and expense and as your property and will deliver it to you on demand.

"3. We shall have no responsibility as to converted or confiscated cars until they are repossessed or recovered and tendered as above. You will allow us the cost of repairing actual direct collision damage necessitating repossession; the allowance is not to exceed the unpaid balance on the car after deducting both the 'as is' value and the amount of any deferred certificate or other special holdback relating to the car. Where the resale value of the repaired car (excluding overhead and salesman's commissions) exceeds the unpaid balance, the excess will be deducted from the collision allowance.

"4. Your rate charts will include, for our protection, reserves as outlined in your reserve arrangement effective at the time paper is purchased by you. No reserves are to be set up in respect of short term note, demonstrator or other special plans announced by you from time to time, except as may be agreed upon hereafter in writing. Three times in each twelve-month period, if we are not then indebted to you, you will pay us our accumulated reserves in excess of 3% of the then aggregate unpaid balances on paper purchased from us. If you stop buying our paper, you may hold and apply all reserves until liquidation of all paper purchased from us is completed.

"5. If you refund any part of the service charge because an account is prepaid, we agree to pay you the same percentage of all reserves credited to or paid us on the account as the amount of service refund bears to the amount of the original charge exclusive of insurance premium.

"6. If, in reselling repossessed passenger cars which we purchase from you, covered by paper sold to you in any twelve-successive-month period, we incur a loss in excess of 3% of the volume of our paper sold you during said period, plus the amount of our reserves for said period, you shall reimburse us for such excess, provided we have resold the cars for their reasonable value within 90 days after delivery to us. We shall credit total profits on resales against total net losses. This paragraph applies only (a) if we have sold you paper covering at least 100 cars during such period, (b) if we perform all of our obligations to you, and (c) if, before incurring such excess losses, we give you written notice of the offered price of each car and the opportunity to resell it.

"7. We will be under full recourse liability to you on the assignment of paper covering equipment other than described in paragraph 1 above notwithstanding the language of such assignment or if in connection with any transaction covering equipment described in paragraph 1 we make any settlement with a customer without your written consent, if we disclose any part of this agreement to the customer, if we breach any provision of the assignment to you, and on paper which bears or in connection with which you receive our guaranty. In any such cases you may make any necessary changes in our endorsements or assignments to express such liability. If we are in default to you under this or any other agreement or obligation at the time of any repossession, cars may be tendered by registered mail notice sent to the last address shown by your records, instead of as provided in paragraphs 2 and 3 above; if we are not then doing business as a going concern, tender of repossessed cars is waived. In case we fail to purchase repossessed cars we will be responsible for any deficiency incurred by you in the resale of such repossessed cars at public

purpose of the foregoing instrument was to protect him against personal liability on all paper which he might sell and assign to appellee without recourse; that if such was not its clearly expressed purpose, it was reasonably susceptible of that construction and since it was written by appellee it should be so construed; and if that was not the true intent and meaning of the instrument as a whole, then it had no material meaning as applied to the facts of this case and should be held to be void and unenforceable as a contract. In its brief, appellee says: "Both the plaintiff and defendant intended that the defendant should not. be personally bound to pay the customer's note but that in the event the automobile was recovered or repossessed the defendant should buy it back and pay the unpaid balance due, subject to the offsets and balances established under the other terms of the contract."

In passing upon the contentions thus presented, it is the duty of this court to consider the alleged agreement in its entirety in order to ascertain from the language therein employed whether the parties thereby intended that appellant should become obligated to purchase the Hudson car under the circumstances here in evidence. If such was the general intent and leading purpose of the instrument, it should be given that effect in spite of any minor provisions of an inharmonious nature, provided such intent is not in conflict with any applicable rule of law. 10 T.J. p. 272, Sec. 159 and authorities.

We entertain considerable doubt as to whether the alleged agreement ever imposed any binding obligation on either party to this suit. Most of its terms and provisions are so ambiguous that its true intent and meaning as a whole is vague, indefinite and uncertain. Furthermore, even though it had been signed by appellee, it did not purport to obligate appellant to sell any paper to appellee and it did not obligate appellee to buy any paper that might be tendered to it by appellant. But if the instrument was sufficiently certain in its terms to have any meaning and if it ever amounted to anything more than a unilateral agreement signed by appellant without any consideration, we have no doubt whatsoever that it ought to be construed from its four corners as imposing no legal obligation on appellant to purchase the Hudson car from appellee.

■ In order to impose any obligation upon appellant to purchase the car, it is unquestionably necessary to apply paragraphs 2 and 3 as a part of the protection agreement. But paragraph 1 thereof expressly provides that in certain cases "paragraphs 2 and 3 shall not apply." What, then, is the meaning of the expression "in such cases" as contained in the last clause of the complete sentence embraced in paragraph 1? It will be noted that the clause immediately preceding such expression is set apart from the remainder of the sentence in which it is found by two semicolons. The antecedent clause contains two exceptions (or a double exception) relating to two types of paper which it was contemplated would be assigned without recourse and with recourse, respectively. If the expression "in such cases" was not intended to include both of the antecedent exceptions, then we think it would be more reasonable to assume that the parties thereby intended that paragraphs 2 and 3 would apply in cases where the paper was to be assigned with full recourse than to cases where the paper was to be assigned without recourse. In our opinion, any other construction would convert

or private sale held with or without notice, at which you may purchase.

"8. This agreement shall apply to all paper hereafter sold to you as above stated, irrespective of transfers between or extensions of time to customers and until the paper is liquidated, unless otherwise specifically agreed in writing with respect to the particular paper. No waiver or change of any part of this agreement shall be binding on you unless evidenced by writing signed by one of your officers.

"9. The purchase of contracts by you from us shall constitute acceptance by you of this agreement, which shall cover all such purchases. This agreement shall inure to and bind our respective successors and assigns and any present and future company affiliated with you which may transact business hereunder."

paragraph 1 into a jargon of doubletalk, would defeat the dominant purpose of the instrument as a whole in that it would deprive appellant of any effective protection against liability on paper sold to appellee without recourse, and would change the proposed agreement into an instrument of wholesale oppression for automobile dealers rather than a protective agreement for their benefit.

The evidence shows that the mortgage-note involved in this suit did not cover any of the types of cars described in the second exception contained in paragraph 1 of the protection agreement, in that the Hudson car sold to Spann was not a commercial car, bus or taxi, and Spann was not a relative or employee of the dealer. Appellant testified to facts showing that when he sold and assigned the Spann mortgage-note to appellee without recourse, he did not intend thereby to obligate himself to indemnify appellee against any character of loss it might sustain in the event Spann should fail to pay the note, and it was not his understanding at any time that the protection agreement was intended to impose any such obligation upon him. On the contrary, it was his understanding that the proposed agreement was intended to protect him from personal liability of any kind on all paper sold to appellee other than that described in the second exception contained in paragraph 1 thereof, and but for such understanding on his part he would not have signed the proposed agreement. He further testified that such understanding was induced, in part, by reading the language employed in the proposed agreement after he had fully discussed the subject matter thereof with appellee's soliciting agent.

■ It is well settled that a contract which is ambiguous in its terms or doubtful in its meaning as a whole should be construed most strongly against the party who drew it and selected the language therein employed. 10 T.J. p. 277, Sec. 162 and authorities; 12 Amer.Jur. p. 795, Sec. 252 and authorities. This just and reasonable rule is grounded upon the principle that the party who prepares the contract "is responsible for ambiguities in his own expressions and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the court will adopt a construction by which they will mean another thing more to his advantage". 17 C.J.S., Contracts, § 324, p. 753. The evidence in this case shows that appellee's agents designed and printed the protection agreement, as well as the form of the mortgage-note and assignment here involved. Since the ingenious wording, punctuation and arrangement of this subtle document was solely the brain-child of appellee's agents, it is our opinion that its ambiguities and conflicting provisions ought to be construed most strongly in favor of appellant and against the interest and contentions of appellee. Whittington v. Cameron Compress Co., Tex.Civ.App., 268 S.W. 216; Id., Tex.Com.App., 280 S.W. 527; Magnolia Pet. Co. v. Aiken, Tex.Civ.App., 289 S.W. 152; Powers v. Sunylan Co., Tex. Com.App., 25 S.W.2d 808, pts. 8 and 9 and authorities.

■ To say that the parties did not intend in this transaction for appellant to have any personal liability on account of Spann's failure to pay his note but that they did intend for him to be personally liable for the payment of an amount equal to the unpaid balance due thereon as the purchase price of the car is to insist upon a technical distinction which is without any substantial difference insofar as legal consequences are concerned. Liability in either event would have been contingent upon the same ultimate fact, viz., the failure of Spann to pay his note. The amount of liability in either event would have been substantially the same. It is axiomatic that things equal to the same thing are equal to each other. Appellee admits that appellant was not liable on account of Spann's failure to pay his note under the assignment without recourse, and we hold that he was not liable for the payment of an amount equal to the unpaid balance due thereon as the purchase price of the car under the so-called protection agreement.

Therefore, the judgment appealed from is reversed and judgment is here rendered that appellee take nothing by reason of this suit.